**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

WILLIAM MEYERS, SR., et al.

        Plaintiffs

    v.

BALTIMORE COUNTY, MARYLAND et al.

        Defendants

:

:

:           Civil Case No. L-10-549

:

:

:

o0o

**<u>MEMORANDUM</u>**

This case arises out of the tragic death of Ryan Meyers.  The Plaintiffs, parents of the decedent, bring suit against the Baltimore County Police Department and three individual Baltimore County Police Officers.  Now pending before the Court is the Defendants' Motion for Summary Judgment.  Docket No. 33.  The issues have been fully briefed, and on July 11, 2011, the Court convened a hearing and received oral argument.  For the reasons stated herein, the Court will, by separate Order, GRANT the Motion.

I.       **BACKGROUND**

Because the Defendants move for summary judgment, the Court analyzes the facts in the light most favorable to the Plaintiffs.  Ryan Myers was diagnosed with bipolar disorder at the age of 15 and suffered from debilitating mental illness for most of his life.  At age 40, Ryan continued to live with his parents, Anna Mae Meyers ("Mrs. Meyers") and William Meyers, Sr. ("Mr. Meyers"), and his brother, William Meyers, Jr. ("Billy Meyers" or "Billy").  At the time of his death, he was under the care of a doctor at Sheppard Pratt, a mental health facility, and was

1

prescribed two anti-psychotic medications: Seroquel (used to treat schizophrenia), and Lamictal (used to treat bi-polar or manic-depression disorders).

During the previous ten years, the Meyers family had called 911 on five separate occasions to have Ryan, who stood six feet tall and weighed approximately 260 pounds, forcibly detained by the police so that he could be taken for psychiatric evaluation.  Two of these incidents led to Ryan's involuntary committal at Sheppard Pratt for 30-day periods.

The events giving rise to this suit occurred on March 16, 2007.  At 10:55 p.m., Mrs. Meyers called 911 and reported to the operator that her sons Ryan and Billy were engaged in a fistfight.  Mrs. Meyers then ceased communicating with the 911 operator.  The telephone line remained open, however, and screaming could be heard in the background.  Baltimore County police were immediately dispatched to the Meyers residence.

The first officer on the scene was Vincent Romeo, who arrived to find Billy and Mr. Meyers in the front yard.  Mr. Meyers was holding a towel over a cut on his nose.  Mrs. Meyers had gone to her daughter's home next door.  Officer Romeo could see Ryan inside the house, pacing back and forth while holding a baseball bat.

Billy recounted to Officer Romeo the events surrounding the 911 call: He had heard a commotion in the kitchen, and heard his mother say, "Stop, Ryan.  You're hurting me."  Billy Meyers Dep. 6.  Billy ran in, immediately punched his brother, and the two began to fight.  Mr. and Mrs. Meyers were knocked to the floor amidst the fighting.  At some point, Ryan acquired a baseball bat and a barbeque fork, at which point the rest of the family retreated outside the house to wait for the police.  Billy informed Officer Romeo that Ryan was bipolar and had "problems upstairs."  Id. at 9.  According to Billy, Officer Romeo "asked us if [Ryan] hit anybody with the

bat, and we said no."[1]  Id.

Officer Romeo radioed for backup.  The first officer to answer his call was Karen Gaedke.  Officer Gaedke had arrested Ryan two days previously, following an incident at a Royal Farms convenience store, after which she had taken him to Franklin Square Hospital to get his medication.  Because of her relationship with Ryan and her familiarity with his situation, Officer Gadke felt that she might be able to calm him down.

Both Officer Romeo and Officer Gadke talked to Ryan through the front door in an attempt to get him to drop the bat and come out of the house peacefully.  Ryan refused, responding only, "You're not my father," and "No, you're going to kill me."  Billy Meyers Dep. 12; Romeo Dep. 25.  At some point the officers determined that Ryan was not going to exit the house peacefully, and Officer Romeo put in a call for a Taser operator.  In response to this call Officer Steven Mee, the Taser operator on duty that night, responded to the scene.  While still talking to Ryan, the officers repeatedly attempted to unlock the front using a key that Billy Meyers had given them.[2]  Each time, Ryan immediately re-locked the door.  At some point two more officers, Andrew Callahan and Michael Zellers, also arrived.

Eventually, Ryan turned his back on the door and began to walk away.  This allowed the officers to quickly unlock the door and gain entry to the house.  Officer Romeo was the first through the door, followed by Officer Mee.  Billy Meyers entered third.

The officers filed into the living room and ordered Ryan to drop the bat.  When he turned

---

[1]      It is at this point that the parties' accounts begin to diverge.  Officer Romeo testified that Mr. Meyers "advised that his son had hit him with a baseball bat."  Romeo Dep. 7.  Mr. Meyers maintains that Ryan never hit him and that he never told Officer Romeo otherwise.  Meyers, Sr. Dep. 9–10.

[2]      Both Officer Romeo and Officer Gadke testified that Mr. Meyers and/or Billy Meyers explicitly requested that they enter the house and bring Ryan out.  Romeo Dep. 10, 18; Gadke Dep. 24.

to face them but did not immediately drop the bat, Officer Mee deployed his Taser in probe

mode, firing the probes into Ryan's torso.[3]  Unfortunately, the initial jolt of electricity failed to

incapacitate Ryan, who still did not drop the bat.  Seconds later, Officer Mee delivered a second

cycle of electricity.  At this point Ryan dropped the bat, but remained standing.  Officer Mee

discharged the Taser a third time, at which point Ryan fell to the ground and three officers

attempted to subdue and handcuff him.[4]

      The police struggled on the ground with Ryan for approximately two and a half minutes

before finally cuffing his hands in front of him and securing a zip tie around his legs.  During this

time, Officer Mee discharged the Taser in probe mode once more, then removed the probes and

used the Taser in stun mode an additional six times.[5]  The officers contend that Ryan fought

them fiercely, kicking, biting, and at one point even regaining control of the baseball bat.  Billy

Meyers concedes that his brother was struggling with the officers, that they were telling Ryan to

---

[3]     A Taser can be used either in "probe" mode or in "stun" mode.  In probe mode, two probes are fired from a distance, attached to thin electrical wires, to lodge in the skin of the subject.  The Taser then delivers a fixed five-second cycle of electricity designed to cause electro-muscular disruption, effectively freezing the subject's muscles and thereby temporarily disabling him.  In stun mode, the probe cartridge is removed and the Taser's electrodes are applied directly to the subject.  The Taser operator can then deliver a painful electric shock, the duration of which is completely within his control.  In stun mode, the Taser does not cause muscular disruption or incapacitation, but rather functions only as a "pain compliance" tool.  See Mee Dep. 6–8; Defs.' Mot. Summ. J. Ex. 12, U.S. Dept. of Justice publication "Conducted Energy Devices: Development of Standards for Consistency and Guidance" (hereinafter "DOJ Taser Guidelines"); Maj. Mark Warren Aff. 13–14.

[4]     Defendants' counsel explained at oral argument that when the Taser is fired in probe mode but the probes do not make good contact with the subject, use of the Taser causes only pain and not incapacitation.  See also Warren Aff. 14.  Counsel suggested that this was the case the first two times Officer Mee cycled the Taser, but that the parties' movement eventually created a full circuit, resulting in a more effective third cycle.

[5]     Both the length of the altercation and the number of Taser uses are verified by the Taser log, which records the time and duration of each discharge.  See Defs.' Mot Summ. J. Ex. 17. What is not recorded, however, is whether and to what extent the electric shock is actually delivered to the subject.  The fourth probe cycle appears to have had no effect because one of the probes wires had become wrapped around Officer Callahan's leg.  See Mee Dep. 23.

stop resisting, and that the altercation lasted between two and three minutes, but describes Ryan's resistance as "moving his legs, like." See Meyers, Jr. Dep. 16, 19, 21, 25.

When Ryan finally relaxed, he appeared to the officers to be unconscious or asleep. Officer Zellers checked for vital signs and verified that Ryan was breathing and had a pulse. The officers then moved Ryan to the center of the living room, where there was more space, and recuffed his hands behind his back. Officer Zellers checked Ryan's pulse again, and found it weaker. At this point an ambulance, which had been dispatched as soon as Officer Mee reported the initial Taser discharge, arrived. The paramedics found that Ryan had gone into cardiac arrest and were unable to revive him.

The Medical Examiner's post-mortem report revealed the cause of death as "cardiac arrythmia [sic] due to cardiomegaly complicated by agitated behavior in association with police restraint."[6] Defs.' Mot. Summ. J. Ex. 18 at 8. The report stated that "[t]he relative contribution of the heart disease, agitated behavior and restraint methods cannot be determined with certainty . . . ." Id.

Following Ryan's death, his parents brought suit against Baltimore County and Officers Mee, Romeo, and Gadke. The Amended Complaint asserts the following claims: Maryland Survival Act (Count I), Wrongful Death (Count II), Excessive Force in violation of the Fourth Amendment (Count III), Negligent Training and Supervision (Count IV), Violation of Articles 24 and 26 of the Maryland Constitution (Count V), Gross Negligence (Count VI), and Violation of the Americans with Disabilities Act and the Rehabilitation Act (Count VII).[7] On December

---

[6]    Cardiac arrhythmia is a loss or abnormality of the heart rhythm. Cardiomegaly is an enlargement of the heart, also known as macrocardia, megacardia, or megalocardia. Stedman's Medical Dictionary (27th ed. 2000).
[7]    Plaintiffs have recently conceded that they cannot state a claim under the Americans with Disabilities Act or the Rehabilitation Act, and have agreed to dismiss this count.

14, 2010, the Court entered an Order bifurcating the case and reserving litigation of supervisory liability claims against Baltimore County until the issue of the individual officers' liability had been resolved.  The Defendants now move for summary judgment as to all counts.

## II.     LEGAL STANDARD

The Court may grant summary judgment when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial).  Nevertheless, in determining whether there is a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party.  Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987).  Hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment.  See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro, 64 F.3d 962, 967 (4th Cir. 1995).

## III.    ANALYSIS

Each of the Plaintiffs' claims rests on the existence of a single underlying wrong, the use of excessive force to effect a seizure in violation of Ryan Meyers's Fourth Amendment rights. The Defendants argue that no constitutional violation occurred and that, even if it did, they are entitled to qualified immunity.  The Court will analyze the events of March 16, 2007 in three

stages: the officers' determination to seize Ryan, the initial tasings that caused Ryan to drop the baseball bat and fall to the ground, and the struggle and additional tasings that followed. Pursuant to the Supreme Court's decision in <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009), the Court exercises its discretion to use the two-step procedure of <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), asking first whether a constitutional violation occurred and second whether the right violated was clearly established.  If the right was not clearly established, the officers are entitled to qualified immunity notwithstanding the violation.  <u>Id.</u> at 200–01.  Because the Court finds the officers' conduct to have been reasonable at the first two stages and protected by qualified immunity at the third, the Defendants are entitled to summary judgment.

### a.   Seizure of Ryan Meyers

Based on what they knew from the 911 call and from their brief interviews with Mr. Meyers and Billy, the officers had ample probable cause to arrest Ryan.  Probable cause is a "practical, nontechnical conception" that addresses the "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  <u>Illinois v. Gates</u>, 462 U.S. 213, 231 (1983).  The report of a fistfight and screaming from the 911 operator, combined with Billy's statement that his mother had told Ryan to stop hurting her and the bloody gash on Mr. Meyers's face, would more than warrant a reasonable officer to believe that Ryan had assaulted members of his family.  This remains true notwithstanding Billy's statement to Officer Romeo that Ryan had not actually hit anyone with the baseball bat.

The police also had probable cause to seize Ryan for an emergency mental health evaluation.  It is well-settled that the standard for a mental health seizure is probable cause to believe that a person poses a danger to himself or others.  <u>Bailey v. Kennedy</u>, 349 F.3d 731, 741 (4th Cir. 2003) (citing <u>S.P. v. City of Takoma Park</u>, 134 F.3d 260, 266 (4th Cir. 1998)).  While

the law does not permit "random or baseless detention of citizens for psychological evaluations,"
Gooden v. Howard County, 954 F.2d 960, 968 (4th Cir. 1992), in this instance the officers had
both firsthand knowledge and information from frightened family members that Ryan had mental
health issues.  His continued agitated state, his refusal to relinquish his weapon, and the injuries
already caused to his parents and brother would permit a reasonable officer to conclude that he
posed a danger to himself or others.

Even if the officers had been mistaken as to whether Ryan was sufficiently dangerous to
render his arrest reasonable, they would be entitled to qualified immunity on this point.  While it
is true that "the general right to be free from seizure unless probable cause exists is clearly
established in the mental health seizure context," the Fourth Circuit specifically highlighted in
Gooden "the lack of clarity in the law governing seizures for psychological evaluations."  954
F.2d at 968.   "We are aware of no cases that define 'dangerousness' with the requisite
particularity or explain what type of evidence would be constitutionally sufficient to establish
probable cause of a dangerous condition."  Id.; see also Bailey, 349 F.3d at 739.  The Court is
aware of no authority that would put the officers on notice that the information they possessed
would be insufficient to support an arrest.  Cf. Bailey, 349 F.3d at 740 (finding that a neighbor's
911 call reporting that the plaintiff had threatened to kill himself was not enough, without more,
to establish probable cause for police to seize him for a psychological evaluation).

Even assuming that probable cause existed, Plaintiffs challenge the reasonableness of the
seizure by suggesting that the police should not have entered the house in an attempt to subdue
Ryan.  They suggest that the officers should have summoned the department's Mobile Crisis
Team ("MCT"), which includes a mental health clinician.  Alternatively, Plaintiffs' counsel

posited at oral argument that the officers were faced with a "barricade situation" and should have called in a tactical response unit.

Each of these alternatives poses its own problems.[8]  Even if another course of action would have been preferable, courts must refrain from overanalyzing police actions with the benefit of hindsight.  "A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished."  United States v. Sharpe, 470 U.S. 675, 686–87 (1985).  Moreover, "[o]fficers are not required to use the least intrusive means available; they simply must act within the range of reasonable conduct."  Henry v. Purnell, --- F.3d ----, 2011 WL 2725816 (4th Cir. July 14, 2011) (en banc) (Shedd, J. dissenting) (quoting Brooks v. City of Seattle, 599 F.3d 1018, 1025 (9th Cir. 2010)).  On the basis of the record, the Court is satisfied that the Officers did not act unreasonably in entering the house to seize Ryan Meyers.

### b.  Initial Tasing of Ryan Meyers

Though the Officers were justified in seizing Ryan, they could not do so in any manner they chose.  The Fourth Amendment's prohibition on unreasonable seizures includes the right to be free of "seizures effectuated by excessive force."  Schultz v. Braga, 455 F.3d 470, 476 (4th

---

[8]     To the officer on the scene, the situation would look more like a run-of-the-mill domestic violence dispute than what one might think of as a barricade situation.  Ryan had no hostage and no firearm.  Defendants do concede that they could have contacted the Mobile Crisis Team, but it is clear from the team's operating procedures that it would not have been able to respond to the scene until Ryan had been disarmed.  The MCT includes a civilian mental health clinician, and both Officer Romeo and the team's commander testified that it is impermissible to put a civilian in any situation involving actual or potential violence, even on the other side of a closed door. See Romeo Dep. 15; Lt. Stephen Gossage Dep 18–19 ("[The subject] may at that point be handcuffed, or he may be seated on a sofa.  You know, in which at that point when it's deemed totally safe, then and only then would the team be allowed to come in."); see also Defs.' Mot. Summ. J Ex. 22, MCT Standard Operating Procedures 3 (MCT is not to respond to: "hostage/barricade situations, domestic violence with a weapon, any situation with active violence").

Cir. 2006).  The question, therefore, is whether Officer Mee's use of the Taser constituted

excessive force.  The standard, again, is one of objective reasonableness.  Scott v. Harris, 550

U.S. 372, 381 (2007).  "The 'reasonableness' of a particular use of force must be judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

Graham v. Connor, 490 U.S. 386, 396 (1989).

According to Billy Meyers, the police entered the house, ordered Ryan to drop the bat,

and deployed the Taser without giving him time to react.  Billy Meyers Dep. 15–16.  Billy also

claims that upon being tased, his brother screamed and told the officers to stop, that he gave up.

Id.  It is undisputed, however, that Ryan did not drop the bat until after Officer Mee delivered the

second cycle of electricity, nor was he incapacitated as would be expected if the Taser probes

had made good contact.  After the third cycle, Ryan fell to the ground and the officers struggled

to handcuff him.

Even assuming the truth of Billy Meyers's version of events, no reasonable jury could

conclude that Officer Mee used excessive force in delivering the first three Taser cycles to

disarm and incapacitate Ryan.[9]  As an initial matter, it is important to note that while death

---

[9]    While the bulk of Billy Meyers's testimony must be accepted as true, the Court does note
several distressing inconsistencies.  For example, Billy claims to have been the third person to
enter the house, but this is at odds with the affidavit testimony of Officer Zellers, who was
initially assigned to cover the back door of the house in case Ryan attempted to escape through
the rear.  Officer Zellers states that when he came around to the front of the house following the
other officers' entry and the beginning of their confrontation with Ryan, both Mr. Meyers and
Billy Meyers were still on the front porch, where he told them to remain for their own safety.
Zellers Aff. ¶¶ 2–3.  Billy states that "at least five" officers followed him into the house,
including a "black cop [and a] lady cop."  Billy Meyers Dep. 18.  It is undisputed that there were
only five officers on the scene, and none was African American.  Billy also claims that Ryan was
"hog-tied," with his hands and feet cuffed together.  Id. at 18–19.  Plaintiffs' expert, however,
concedes that this never occurred.  See Andrew Scott Dep. 71–75.  Finally, Billy's testimony that
Ryan was not given time to comply with the officers' orders to drop the bat and made no
threatening move towards them is called at least partly into question by the fact that Ryan's back
was to the door when the officers entered, yet he was tased in the chest.

tragically resulted in this instance, use of a Taser is not generally considered deadly force. Rather, "the Taser, in general, is more than a non-serious or trivial use of force but less than deadly force," thought "there is a lot of room between those end points." Mattos v. Agarano, 590 F.3d 1082, 1087 (9th Cir. 2010). In the majority of police departments, the use of a Taser is considered roughly equivalent to the use of oleoresin capsicum gas, also known as pepper spray. See Andrew Scott Dep. 13, 28–29.

Officer Mee was faced with the task of subduing an armed, agitated, physically imposing suspect in the confined space of a living room without risking his own safety or that of his fellow officers. Moreover, Ryan had refused several orders to drop the bat before police even entered the house. In these "tense, uncertain, and rapidly evolving" circumstances, Officer Mee was not required to give Ryan the opportunity to attack before attempting to disable him. Graham, 490 U.S. at 396; see also Mattos v. Agarano, 590 F.3d 1082, 1088–90 (9th Cir. 2010) (finding reasonable the tasing of an unarmed woman who interfered with officer's attempt to arrest her husband, and noting the unusually tense and dangerous nature of domestic violence calls); Isom v. Town of Warren, 360 F.3d 7 (1st Cir. 2004) (police reasonable in using pepper spray to disarm mentally disturbed man who refused repeated requests to put down an axe); Forrester v. City of San Diego, 25 F.3d 804, 807–08 (9th Cir. 1994) (ample evidence supported the jury's conclusion that officers who used pain compliance arrest techniques on trespassing protestors, but did not deliver any physical blows or cuts, had not used excessive force); McConnell v. McKillip, 573 F. Supp. 2d 1090 (S.D. Ind. 2008) (police reasonable in using a Taser to effectuate an arrest of a plaintiff armed with a wooden board).

When Ryan did not drop the bat after the first cycle, and when the first two cycles did not incapacitate him as intended, Officer Mee was likewise justified in delivering additional shocks.

See, e.g., Wargo v. Municipality of Monroeville, 646 F. Supp. 2d 777, 785 (W.D. Pa. 2009) (subsequent tasings not excessive after initial tasings proved ineffective).  In sum, Officer Mee's actions were objectively reasonable when viewing the record in the light most favorable to the Plaintiffs.

### c.   Stun Mode Tasings

After Ryan fell to the ground in the small area between the dining room table and the wall, Officers Callahan, Zellers, and Romeo ordered Ryan to stop resisting and attempted to handcuff him in a struggle that lasted approximately two and a half minutes.  There is significant dispute between the parties as to Ryan's level of resistance during this time.  Officers Callahan and Zellers maintain that Ryan was putting up a violent fight, and relate that they both went so far as to strike him in the jaw to prevent him from biting them and recovering the baseball bat that he had dropped earlier.  See Callahan Aff. ¶¶ 4–5; Zellers Aff. ¶¶ 4–6.  They further claim that Ryan was screaming, "Just kill me 'cause I'm going to kill you fuckers . . .  I want to die, I want to die."  Id.

By contrast, Billy Meyers does not recall Ryan saying anything, though he admits that the officers were telling Ryan to stop resisting.  Billy Meyers Dep. 21.  When asked if he actually saw Ryan resisting, he responded, "He's like trying to move his legs, move his legs like.  He is like moving his legs."  Id. at 25.  During the altercation, Officer Mee used the Taser in stun mode six more times in an attempt "to get him to comply, to put his hands, and stop fighting us."  Mee Dep. 45.

Here, the Court cannot say as a matter of law that Officer Mee's actions were objectively reasonable.  Some additional use of the taser, as a pain compliance tool deployed against an uncooperative subject, was almost certainly acceptable.  There is no dispute that Ryan was able

to prevent three officers, working in concert, from handcuffing him for several minutes.  As noted earlier, additional tasings may be justified when initial tasings fail to have the desired effect and the subject continues to struggle.  See Wargo, 646 F. Supp. 2d 777.  Moreover, guidelines promulgated by the Department of Justice, which the Court considers probative of reasonableness, permit the use of a Taser against subjects who are "actively resisting."  DOJ Taser Guidelines 23.  Active resistance includes "[p]hysically evasive movements to defeat an officer's attempt at control, including bracing, tensing, pushing, or verbally signaling an intention to avoid or prevent being taken into or retained in custody."  Id. at 15.  Courts have also found that use of a Taser can be reasonable even as against restrained or nonviolent subjects who resist arrest and refuse to comply with lawful police commands.  For example, in Buckley v. Haddock, 292 F. App'x 791, 795 (11th Cir. 2008) the Eleventh Circuit found no Fourth Amendment violation in a case in which a handcuffed suspect arrested for speeding was tased three times because he resisted arrest by lying on the ground, refusing to stand, and crying.  In Schumacher v. Halverson, 467 F. Supp. 2d 939 (D. Minn. 2006), the court found that police did not act unreasonably in tasing an inebriated man who resisted arrest by grabbing onto a basketball pole and refusing to let go.

It is obvious, however, that an officer's purview to tase a noncompliant subject is not unlimited.  The Department of Justice Guidelines state that additional Taser applications should be restricted to the minimum necessary to place the subject in custody.  DOJ Taser Guidelines 23.  Officer Mee acknowledged that the situation in which he found himself "would be one of the more dangerous times to tase an individual."  Mee Dep. 44–45.  There is simply insufficient evidence in the record to reflect whether it was actually necessary to deliver six additional shocks.

Nevertheless, even assuming Officer Mee's Taser use to have been excessive in this respect, he is entitled to qualified immunity.  Mee would not be liable unless "[t]he contours of the right [he is alleged to have violated were] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  The question, properly presented, is whether clearly established law would have put an officer on notice that he must in some circumstances limit the use of his Taser in stun mode, even though the subject continues to struggle and resist officers' efforts to handcuff him.  The answer is no.

The Fourth Circuit has recently noted that "the objective reasonableness of the use of Tasers continues to pose difficult challenges to law enforcement agencies and courts alike." Henry, 2011 WL 2725816 at *11 (Davis, J. concurring).  "Case law related to the Taser is [in the] developing stage. . . . That the law is still evolving is illustrated in cases granting immunity for that very reason."  Id. (quoting McKenney v. Harrrison, 635 F.3d 354, 361–62 (8th Cir. 2011) (Murphy, J. concurring)).  Courts seem to be in rough accord that use of a Taser is impermissible when used in a sadistic manner, or against an individual who is in custody or otherwise poses no threat.  See Mahamed v. Anderson, 612 F.3d 1084, 1086 (8th Cir. 2010) (denying qualified immunity to jailer who tased inmate in the genitals while inmate was lying on the floor of his cell); Brown v. City of Golden Valley, 574 F.3d 491, 499–500 (8th Cir. 2009) (denying qualified immunity to officer who tased woman refusing to leave her car during traffic stop); Bryan v. McPherson, 590 F.3d 767 (9th Cir. 2009) (finding that police used excessive force in tasing a disoriented, half-naked man stopped for a seatbelt violation); Orems v. Rephann, 523 F.3d 442, 447 (4th Cir. 2008) (denying qualified immunity to officer who

repeatedly tased 100-pound woman handcuffed in back of squad car for displaying a lack of respect).[10]

Yet the Court's research reveals no authority, and certainly not a clearly established legal principal, offering guidance as to the point at which continued tasings become excessive when the suspect is actively resisting.  A court with ample time to deconstruct a situation may determine in hindsight that alternative procedures would have been optimal, or that officers overstepped the amount of force strictly necessary to subdue a suspect.  Such a judgment, however, is rarely more than "indulge[nce] in unrealistic second-guessing."  Sharpe, 470 U.S. at 686.  The law does not countenance viciousness.  Nor, however, does it require perfection.  The interstice is composed of the "mistaken judgments" that qualified immunity must protect if police are to do their jobs safely and effectively.  See Malley v. Briggs, 475 U.S. 335, 341 (1986).  The Defendants are entitled to summary judgment.


IV.    CONCLUSION

For the foregoing reasons, the Court will, by separate Order of even date, GRANT the Defendants' Motion for Summary Judgment.  Docket No. 33.


Dated this 28th day of September, 2011

/s/
_____
Benson Everett Legg
United States District Judge

---

[10]    The main exception seems to involve protesters who refuse to comply with police orders to disperse.  See Forrester, 25 F.3d 804; Crowell v. Kirkpatrick, 667 F. Supp. 2d 391 (D. Vt. 2009) (police justified in using Taser on protesters who had trespassed on company's land to protest impending development and refused to leave premises).  Cases such as Mahamed and Orems, which involved detainees and are, therefore, analyzed under the Fourteenth Amendment rather than the Fourth Amendment, do not speak authoritatively on the issue but, nevertheless, remain instructive.